FILED IN CHAMBERS
U.S.D.C. - Atlanta

OCT 28 2020

James N. Hatten, Clerk
By: B P   Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA (ATLANTA DIVISION)

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| vs | ) | Case No. 1:17-CR-00084-LMM |
| | ) | |
| KIM EARLYCUTT | ) | |

## MOTION FOR REDUCTION IN SENTENCE
### ("COMPASSIONATE RELEASE" – DEBILITATED MEDICAL CONDITION)

COMES NOW, Kim Earlycutt is 57 years old and an inmate incarcerated with failing health. Ms. Earlycutt is suffering from Asthma, Hypertension, Upper Respiratory Disease, Multiple Sclerosis and COPD, pre-existing chronic, debilitating and life-threatening conditions identified by the Center for Disease Control ("CDC") as being potentially high risk for COVID-19 complications. She is respectfully requesting the Court to reduce her sentence to time served or in the alternative, to modify her sentence to release her immediately to home confinement as a condition of supervised release under 18 U.S.C. §3582(c)(1)(A)(i).

The Court's authority rests upon 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act ("FSA"). The circumstances that support Ms. Earlycutt's "compassionate release" easily satisfies the statutory "extraordinary and compelling" test, even without considering the COVID-19 pandemic. The difficulty of controlling the spread of COVID-19 in prisons, combined with the risk that Ms. Earlycutt will die from the virus, should she become infected, makes her application all the more compelling.

Ms. Earlycutts' medical conditions have substantially diminished her ability to provide self-care. Through this pandemic, the BOP is not able to provide Ms. Earlycutt the appropriate treatment or preventive care for her illnesses, Asthma, Hypertension and her other underlying illnesses as well as not providing any adequate treatment to her Multiple Sclerosis.

According to the latest CDC guidelines, immunocompromised individuals such as those who suffer from asthma may be at a higher risk for severe illness from COVID-19. Because there are

1

currently inmates and staff members who are actively positive in her facility, there is a greater risk of exposure.

COVID-19 presents an unprecedented public health risk, with a particularly high risk to the health of individuals in confined spaces. Accordingly, the global public health response has been to promote isolation, quarantine, and "social distancing." None of these measures can be adequately implemented in a prison environment. The unprecedented threat of COVID-19, which could not have been foreseen at Ms. Earlycutts' sentencing, poses extraordinary risks to the health of prisoners generally, and to Ms. Earlycutt specifically. The measures necessary to contain and prevent infection are difficult, if not impossible, to achieve in a prison environment.

The growing threat of the COVID-19 pandemic, and its proliferation within the prisons, provides an extraordinary and compelling basis for a sentence reduction or modification for an inmate who is particularly medically vulnerable, where that inmate is not a threat to the community or to any person, and where their other personal characteristics weigh in favor of a reduction or modification of their sentence. The existence of the COVID-19 virus in the facility where Ms. Earlycutt is incarcerated, in combination with her medical condition, makes her particularly vulnerable to dire consequences if she contracts the virus. A reduction to a sentence of time served or to home confinement for Ms. Rhodes would be sufficient, but not greater than necessary to accomplish the goals of sentencing under 18 U.S.C. §3553(a) and to protect the public.

Kim Earlycutt"s circumstances present a strong case for a compassionate reduction in sentence at this time. She has been in continuous custody since her arrest in November 2016. Research from Johns Hopkins and UCLA shows prisoners are 550% more likely to catch covid, and 300% more likely to die from it. Reports from many institutions and media have stated that Warden's and Case Managers refuse to sign compassionate release paperwork for those that are eligible.

Ms. Earlycutt's facility administrative staff and medical staff has confirmed over 119 cases of COVID-19 at the present time and has put the facility on total lockdown which makes her circumstance more dire.

From in or around January 2012 until in or around January 2015, in the Northern District of Georgia, the defendants, Kim A. Earlycutt and co-conspirator, did knowingly and willfully combine, conspire, and agree with each other and others known and unknown to defraud the United States Department of Treasury, Internal Revenue Service ("IRS"), an agency of the United States, by obtaining and aiding to obtain the payment of materially false, fictitious, and fraudulent income tax refund claims from the IRS. Purpose of the Conspiracy. It was the purpose of the conspiracy for the defendants and their co-conspirators to enrich themselves by causing the preparation and filing of materially false, fictitious, and fraudulent income tax returns with the IRS on behalf of numerous individual taxpayers, claiming refunds that the taxpayers were not entitled to receive, and by thereafter keeping a portion of the money that was refunded by the IRS and to unjustly enrich themselves by obtaining United States Department of Treasury tax refund checks to which they were not entitled. All in violation of Title 18, United States Code, Sections 287 and 2.

Ms. Earlycutt suffers from several chronic and debilitating medical conditions that affect nearly every aspect of her daily life, including Asthma, Hypertension, Upper Respiratory Disease, Multiple Sclerosis and COPD.

These and other underlying conditions from which Ms. Earlycutt suffers, makes her health increasingly tenuous and life in prison increasingly miserable. In fact due to lack of medical resources the medical staff is unable to treat Ms. Earlycutt for her Multiple Sclerosis she painfully suffers. Due to the facility failure to treat her MS condition her health is steadily declining. She is at tremendous high risk of death from COVID-19, should she contract it, and despite the best efforts of the Bureau of Prisons ("BOP"), the prison environment is extremely conducive to the spread of the virus.

Although Ms. Earlycutt's physical health has declined during her incarceration, her personal growth and moral character have flowered as her body deteriorated. She is deeply involved in the prison's religious community and self-development.

Ms. Earlycutt is consistently described by the staff at Tallahassee FCI, her fellow inmates, and others in the community as a kind, compassionate, generous, and sincere woman who is devoted to serving others. Those who have had the opportunity to get to know Ms. Earlycutt, including medical professionals stress that Ms. Earlycutt is not a risk to any person or the community.

Ms. Earlycutt has displayed acts of kindness and caring toward everyone she comes in contact with.

While the Court in contemplating a motion for reduction in sentence must also consider the nature of Ms. Earlycutt's offense conduct, Ms. Earlycutt's release, after serving almost years, would not be outside of the mainstream.

In many ways, Kim Earlycutt is not the same person that she was when committed to custody almost 2 years ago. She has become a deeply religious and moral person whose acts of kindness illustrates the strength of her character. She has devoted herself to self-improvement of herself and other people. She is suffering, badly, and is "desperate" to be reunited with her family and her loved ones. Respectfully, as demonstrated below, she satisfies all the legal criteria for a reduction in sentence at this time, and her application for compassionate release is compelling.

After sentencing, Ms. Earlycutt was sent to Tallahassee FCI in Tallahassee on September 14, 2017. She is a low risk, nonviolent offender with no disciplinary actions where she is currently incarcerated. She poses no risk or dangers to any one or community.

Ms. Earlycutt had a pre-existing condition of MS when she entered custody and after almost 2 years into her sentence of being incarcerated at Tallahassee, Ms. Earlycutt has been diagnosed with Asthma, Upper Respiratory Disease, COPD, Severe Hypertension. The Severe Hypertension which she has been prescribed an oral medication but her conditions remain unstable.  Ms. Earlycutt has continued to experience a serious and progressive decline in both her physical and cognitive wellbeing. She is also suffering from other chronic medical conditions that substantially inhibit her ability to provide self- care within the environment of a correctional facility. Her  most notable medical condition, Asthma has severely weakened her immune system which makes her easily susceptible severely ill or death if exposed to COVID-19. As her diseases progresses, she may experience seizures, dementia, heart strain, respiratory infections, shingles, kidney damage, skin sores, difficulty eating, as well as mental and behavioral changes, sleep problems, depression, memory difficulties, and fatigue (Healthline.com) There is no cure for Asthma and complications relating to the disease can be serious, to fatal.

4

In 2019, the Centers for Disease Control and Prevention ("CDC") rated Asthma (a chronic respiratory disease) the 4th leading cause of death in the United States.

Ms. Earlycutt's history of Asthma, Hypertension, MS, COPD and Upper Respiratory Disease make it increasingly difficult for her to go about her daily life. She frequently drops things and is disoriented by movement and noise, which is a constant issue given the conditions at Tallahassee FCI, as in any prison. At 57 years old she is becoming increasingly weak and has fallen over 10 times and at times needs assistance to get dressed much due to her Multiple Sclerosis (MS). Ms. Earlycutt is in a constant state of fatigue and finds it difficult to stay awake throughout the day.

Given Ms. Earlycutt's legion of underlying health problems from which she suffers, she is also at extremely high risk of suffering serious, if not fatal, complications should she contract COVID-19, which has already infected a number of inmates at FCI Tallahassee, one of whom has died. According to the CDC, in the United States, people with underlying health conditions— including Upper Respiratory Disease, Asthma, Hypertension—appear to be at an especially high risk for severe disease from COVID-19, if they become infected, as compared to people without any underlying health conditions.

Notwithstanding her circumstances and the harsh conditions of her confinement, Ms. Earlycutt has proven herself to be a model inmate and a person of good moral character. She has sustained generosity and brought positivity to others. She has no record of serious misconduct since being incarcerated and she is very highly regarded by her fellow inmates and the staff at Tallahassee FCI. Moreover, Ms. Earlycutt has devoted the past four years to self-improvement and personal growth.

Ms. Earlycutt's conduct during her incarceration has included "numerous prosocial activities, both on an organized basis and on an informal basis. She is especially active within Tallahassee FCI's  religious community.  For years, Ms. Earlycutt has demonstrated a remarkable commitment to the spiritual growth and improved self-development of her fellow inmates. Ms. Earlycutt is in a medical category that increases a person's risk for severe disease or death from COVID-19.

If granted compassionate release, the time Ms. Earlycutt has left will be spent attempting

to manage her illnesses, limiting her level of pain and discomfort, continue being a positive influence on other inmates and reconnecting with her family. Ms. Earlycutt will be residing with her brother, Michael Eaerlycutt at 379 Eagle Nest Way.  I will be employed at Good Eats Healthy Living. 5950 Fairington Road, Lithonia, Georgia where my duties will allow me to manage my health conditions .

Mr. Earlycutt is eager to welcome Ms. Earlycutt home and has agreed to take care of Ms. Earlycutt and ensure that she has access to the best doctors and medical treatments available. Mr.. Earlycutt has the financial means to care for Ms. Earlycutt and assist her as she transitions back into her life and society..


**I.     Federal courts Have the Jurisdiction and the Power to Reduce an Existing Sentence.**

Ms. Earlycutt has exhausted her administrative remedy as required by the court or 30 days has passed from the receipt requested by the warden of the facility.


District courts no longer need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release provisions of 18 U.S.C. §3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies. The reasons that can justify resentencing are not limited to medical, age, or family circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

 18 U.S.C. § 3582(c)(l)(A)(i). This statutory provision is the one under which the defendant moves before the Court.

There are four prerequisites to a court's granting compassionate release under the First Step Act. First, the defendant must have exhausted her administrative rights with the BOP.§3582(c)(l)(A). Second, the court must find that "extraordinary and compelling reasons warrant" release. § 3582(c)(l)(A)(i).

Third, the court must consider the factors set forth in § 3553(a). § 3582(c)(1)(A).

Fourth, the court must find that release is consistent with the Sentencing Commission's policy statements. § 3582(c)(l)(A)(i).

6

A prisoner exhausts her administrative rights when the BOP fails to bring a motion for compassionate release on her behalf and she exercises all administrative rights to appeal, or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" § 3582(c)(r)(A).

Ms. Earlycutt has met those requirements and criteria to warrant her a sentence reduction. The defendant has a history of suffering from Asthma, COPD, Hypertension, MS and Upper Respiratory problems which puts her squarely within any of the Policy Statement's definitions of "extraordinary and compelling reasons," see USSG IB 1.13 cmt. n.1(A)~(D), the defendant asserts that the COVID-19 pandemic, combined with Asthma, COPD, Hypertension, Upper Respiratory problems and MS that is not treated by the prison, puts her in a particular vulnerability to complications from COVID-19. Because of the defendant's illness, this constitutes an "extraordinary and compelling reason" for immediate release.

In the District of Massachusetts the Court determined that Mr. Bucci's circumstances were similar to those that the Sentencing Commission specifically articulated as examples of "extraordinary and compelling reasons" in the Sentencing Commission's policy guidance in places like USSG 181.13 n.1 (C) (ii).


## II.    Extraordinary and Compelling Reasons Consistent with U.S.S.G. § 1B1.13 Exist For the Reduction of Kim Earlycutt's 8 Year Sentence


Pursuant to § 1B1.13, there are at least three extraordinary and compelling reasons warranting a sentence reduction in this case. First, Ms. Earlycutt is "suffering from a serious physical or medical condition" and is "experiencing deteriorating physical or mental health because of the aging process that substantially diminishes" her ability to care for herself "within the environment of a correctional facility" and which is irreversible. U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), (III). Second, Ms. Earlycutt is "57 years old...experiencing a serious deterioration in physical and mental health because of the aging process and...has served almost 2 years" of her custodial sentence. Id. § 1B1.13 cmt. n.1(B). Third, there exist in Ms. Earlycutt's case extraordinary and compelling reasons warranting a reduction in sentence "other than, or in combination with," her serious medical condition. Id. § 1B1.13 cmt. n.1(D).

**A. The Court Should Find Extraordinary and Compelling Reasons Warranting a Sentence Reduction Based on Ms. Earlycutt's Serious Medical Condition**

As set forth above, one of the expressly identified "extraordinary and compelling reasons" recognized by the U.S. Sentencing Commission is the medical condition of the defendant. Specifically, Application Note 1(A)(ii) of § 1B1.13 states, in relevant part, that extraordinary and compelling reasons exist if the defendant is "suffering from a serious physical or medical condition...or experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."

Ms. Earlycutt suffered Asthma, Multiple Sclerosis, Upper Respiratory Disease, Severe Hypertension (High Blood Pressure) and COPD. Her Severe Hypertension which she has been described as an oral medication but her conditions remain unstable and the  institution has failed to treat her chronic, debilitating illness, Multiple Sclerosis, which she suffers extraneous pain..

Ms. Earlycutt, with her numerous chronic medical conditions, has continued to experience a serious and progressive decline in both her physical and cognitive wellbeing. Her chronic medical conditions also substantially inhibit her ability to provide self- care within the environment of a correctional facility. Her diagnosis of Asthma, COPD, Upper Respiratory and Hypertension which is a debilitating disease which will lead to her death. Most notably, Asthma and MS  has severely weakened her immune system which makes her easily susceptible to many illnesses and diseases, especially COVID-19. As the disease progresses, patients may experience seizures, dementia, heart strain, respiratory infections, shingles, kidney damage, skin sores, difficulty eating, as well as mental and behavioral changes, sleep problems, depression, memory difficulties, and fatigue (Healthline.com) There is no cure for Asthma and complications relating to the disease can be serious, to fatal.

Her illness substantially diminishes her capacity to care for herself on a daily basis within the environment of the correctional facility and faced with a high possibility of being exposed to COVID-19 being out at risk of death.

She has shortness of breath, sometimes not able to walk to the cafeteria for meals.

8

At times not able to completely dress herself , finish showers due to she gets tired very quickly and needs help.
She has  fevers and severe headaches.
MS will keep her from being able to feed herself, dress or perform hygiene activities.
Sometimes she is unable to walk and need assistance from other inmates.
Her hands and feet go numb to the point she is  unable to do any daily activities, and has to stay in bed.
She has random spells where my eyes get blurry where I can not see.
She is  limited to the daily activities she is  able to perform.

 In 2019, the Centers for Disease Control and Prevention ("CDC") rated Asthma (a chronic respiratory disease) the 4th leading cause of death in the United States.
Ms. Earlycutt illnesses  make it increasingly difficult for her to go about her daily life. She frequently drops things and is disoriented by movement and noise, which is a constant issue given the conditions at Tallahassee FCI, as in any prison. She is becoming increasingly weak and at times needs assistance to get dressed, put on stockings, and getting her food.


These illnesses and diseases are irreversible and affect nearly every aspect of Ms. Earlycutt's day-to-day life. Ms. Earlycutt's capacity to cope with pain, as well as the manner in which she experiences pain. Ms. Earlycutt's medical records provide ample evidence of the debilitating effects of her conditions, as a result, Ms. Earlycutt now lives with chronic pain.
In addition, the pandemic threat of COVID-19 greatly diminishes the ability of any ailing
 and vulnerable prisoners to provide self-care in a new and additional way. See United States v. Perez, No. 17 Cr. 513-3(AT), 2020 U.S. Dist. LEXIS 57265, at *9-10 (S.D.N.Y. Apr. 1, 2020) ("Confined to a small cell where social distancing is impossible, [defendant] cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus."). Prisoners cannot self-isolate from others who may be infected, cannot maintain at least six feet of separation from others as a precaution, cannot choose whether to wear a mask, and cannot control the cleanliness either of their immediate surroundings or of their general environment.
Courts have routinely found that extraordinary and compelling reasons exist under
similar circumstances, particularly where, as here, the defendant's medical conditions require

frequent monitoring, evaluation, and treatment. See, e.g., United States v. McGraw, No. 2:02-cr-00018-LJM-CMM-01, 2019 U.S. Dist. LEXIS 78370, at *10-11 (S.D. Ind. May 9, 2019) (finding it "highly pertinent" that the defendant's medical conditions, which included chronic pain and recurring diarrhea, "require frequent monitoring, evaluation, and treatment" and determining that, "[t]aken all together,...[defendant's] chronic, serious conditions, including those that are mitigated when properly treated by medical professionals, demonstrate a substantially diminished ability to provide self-care from which he is not expected to recover"). For example, a recent decision from the District of Hawaii found extraordinary and compelling reasons justifying early release pursuant to § 3582(c)(1)(A) & § 1B1.13 of the Sentencing Guidelines where defendant was "73 years old and suffers from serious medical conditions (among them, Parkinson's Disease, asthma and diabetes) which are well-documented and serious...." United States v. Ben-Yhwh, No. 15-00830 LEK, 2020 U.S. Dist. LEXIS 65677, at *14 (D. Haw. Apr. 13, 2020). Similarly, the Southern District of Illinois recently found extraordinary and compelling reasons exist where the defendant "suffers from multiple serious physical conditions," including Asthma, hypertension, and anemia, "and he can no longer care for himself." United States v. Dingle, No. 12-30098, 2020 U.S. Dist. LEXIS 68604, at *4 (C.D. Ill. Apr. 20, 2020); see also United States v. Sholler, No. 17-cr-00181-SI-1, 2020 U.S. Dist. LEXIS 86084 (N.D. Cal. May 15, 2020) (granting motion for compassionate release where defendant suffered from "Parkinson's disease, major depressive disorder, acute sinusitis, diabetes mellitus (type II), hyperlipidemia, ulcerative colitis, and COVID-19 virus infection," finding that "[b]ased on the medical records submitted,... defendant is 'suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover'" (quoting U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I))); Perez, 2020 U.S. Dist. LEXIS 57265, at *9-10 (finding defendant's "recent surgeries, and his persistent pain and vision complications" constitute extraordinary and compelling reasons pursuant to Application Note 1(A)(ii) of § 1B1.13); United States v. Spears, No. 3:98-cr-0208-SI-22, 2019 U.S. Dist. LEXIS 177991, at *9-10 (D. Or. Oct. 15, 2019) ("[Defendant] is nearly 77 years old and has served more than 20 years of imprisonment. His serious, possibly terminal, health problems meet the Policy Statement's categories of a serious medical or physical condition and a serious deterioration in physical

health because of the aging process.... His medical problems also substantially diminish his ability to provide self-care within the environment of a correctional facility. Accordingly, he meets the requirements of the Policy Statement's categories of extraordinary and compelling reasons A(ii)(I), A(ii)(III)...."); United States v. Bellamy, No. 15-165(8) (JRT/LIB), 2019 U.S. Dist. LEXIS 124219, at *2, 9-10 (D. Minn. July 25, 2019) (finding extraordinary and compelling reasons exist where defendant "has several serious chronic illnesses," including heart problems, diabetes, and chronic kidney disease, "is experiencing deteriorating health as a result of the aging process, is capable of only limited self-care, and is confined to his bed or wheelchair more than 50% of his waking hours").

**B. The Court Should Find Extraordinary and Compelling Reasons Warranting a Sentence Reduction Based on Ms. Earlycutt's Deteriorating Physical and Mental Health, and Time Already Served**

Closely related to the first reason, the U.S. Sentencing Commission has also expressly identified the age of the defendant and the period of time served as an additional basis for finding that "extraordinary and compelling reasons" exist, where the inmate is suffering from serious medical conditions, even where there is little or no impact on her ability to provide self-care. Specifically, that "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13 cmt. n.1(B).

Without question, she is experiencing a serious deterioration in both her physical and mental health because of the aging process. As detailed above, Ms. Earlycutt physical and mental wellbeing has been on the decline since she has been incarcerated, suffering from a number of well-documented medical conditions, including, but not limited to, *Asthma,* a virus that attacks cells that help the body fight infection, making a person more vulnerable to other infections and diseases; *Asthma,* is a condition in which your airways narrow and swell and may produce extra mucus causing breathing difficulties, chest pains and is not curable. It is a chronic respiratory, debilitating disease and if not well controlled will be fatal.

Furthermore, Ms. Earlycutt's health will undoubtedly continue to decline in the coming years. This is more than sufficient to establish that extraordinary and compelling reasons exist pursuant to Application Note 1(B) of § 1B1.13. See, e.g., United States v. Davis, No. PJM 00-424-2, 2020 U.S. Dist. LEXIS 40652, at *5-6 (D. Md. Mar. 5, 2020) (finding defendant met the definition of "extraordinary and compelling reasons" as defined by U.S.S.G. § 1B1.13 Application Note 1 where defendant "is 79 years old and reports serious deterioration of his physical health," including having undergone multiple prostate surgeries and being diagnosed with benign localized hyperplasia of the prostate, and "has...served more than 10 years of his sentence"); United States v. Young, No. 2:00-cr-00002-1, 2020 U.S. Dist. LEXIS 37395, at *24 (M.D. Tenn. Mar. 4, 2020) ("[Defendant] is 72 years old and he has served more than nineteen years of his sentence. In addition, his physical health, although perhaps not seriously deteriorating, is nonetheless declining due to chronic illnesses and the aging process. Most notably, he suffers from diabetes that requires multiple daily injections. He has high cholesterol, high blood pressure, and cataracts. In recent years he has been diagnosed with chronic kidney disease and has suffered recurrent bouts of abdominal pain leading to significant weight loss, among other illnesses. The [defendant's] health will no doubt continue to decline with age."); United States v. Mondaca, No. 89-CR-0655 DMS, 2020 U.S. Dist. LEXIS 37483, at *5, 8-9 (S.D. Cal. Mar. 3, 2020) (finding extraordinary and compelling reasons exist where defendant "is 77 years old[,]...has served at least 10 years of his term of imprisonment" and "has a well-documented history of serious deterioration in physical and mental health which is age-related," including benign prostatic hypertrophy, mild- to-moderate degenerative disc disease, and decrease in memory); Spears, 2019 U.S. Dist. LEXIS 177991, at *9-10 ("[Defendant] is nearly 77 years old and has served more than 20 years of imprisonment. His serious, possibly terminal, health problems meet the Policy Statement category[y] of...a serious deterioration in physical health because of the aging process.... Accordingly, he meets the requirements of the Policy Statement's categories of extraordinary and compelling reasons [pursuant to Application Note 1(B)]."); United States v. Cantu-Rivera, No. H-89-204, 2019 U.S. Dist. LEXIS 105271, at *3 (S.D. Tex. June 24, 2019) ("[Defendant] meets the age-related definition of extraordinary and compelling circumstances in U.S.S.G.§ 1B1.13, comment[] (n.1(B)). He is 69 years old, he is experiencing

serious deterioration in physical health because of the aging process (arthritic conditions in multiple joints, cataracts, diabetes, prostate conditions), and he has served 30 years in prison.").

## C. The Court Should Find Extraordinary and Compelling Reasons Warranting a Sentence Reduction Based on Other Facts and Circumstances

Since the enactment of the First Step Act on December 21, 2018, the BOP is no longer the gatekeeper in compassionate release cases, nor is this Court in any way bound by BOP determinations in these matters. As noted in Sester v. United States, 566 U.S. 231, 132 S.Ct. 1463, 182 L.Ed.2d 455 (2012), decisions about sentencing "should not be left to employees of the same Department of Justice that conducts the prosecution."

Under 18 U.S.C. 3582(c)(1)(A)(i), Ms. Earlycutt  must both meet the exhaustion requirement and demonstrate that "extraordinary and compelling reasons" warrant a change of method or reduction of his sentence.

Application Note 1(D) of § 1B1.13 provides that "other reasons," as determined by the Director of the BOP, may constitute extraordinary and compelling reasons warranting a reduction in sentence. U.S.S.G. § 1B1.13 cmt. n.1(D). Although § 1B1.13—which has not been amended since the passage of the FSA—vests the Director of the BOP with the authority to determine when such "other reasons" might warrant a reduction in a particular case, that language is now irreconcilable with the revised statute, which permits a defendant to bring a § 3582 motion to the Court without any response from the BOP or even if the BOP expressly decides that no reasons warrant a reduction of sentence. As such, that aspect of the commentary is not binding on courts and "a court may find, independent of any motion, determination or recommendation by the BOP director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C)...." United States v. Redd, No. 1:97-cr-00006-AJT, 2020 U.S. Dist. LEXIS 45977, at *18-19 (Ed. Va. Mar. 16, 2020); see also Young, 2020 U.S. Dist. LEXIS 37395, at *15 ("[T]he dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act."); United States v.

13

O'Bryan, No. 96-10076-03-JTM, 2020 U.S. Dist. LEXIS 29747, at *3-4 (D. Kan. Feb. 21, 2020). In other words, following passage of the FSA, "federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." Young, 2020 U.S. Dist. LEXIS 37395, at *15. Accordingly, this Court has the power to determine what constitutes extraordinary and compelling reasons for compassionate release. See United States v. Campagna, No. 16 Cr. 78-01 (LGS), 2020 U.S. Dist. LEXIS 54401, at *8 (S.D.N.Y. Mar. 27, 2020).

Here, there are at least two additional bases for finding extraordinary and compelling reasons warranting a sentence reduction.

First, given Ms. Earlycutt's underlying medical conditions, Ms. Earlycutt is at an especially high risk of suffering serious, if not fatal, medical complications should she contract COVID-19 according to the CDC regardless of any type of treatment.

Second, in light of Ms. Earlycutt's exemplary conduct while incarcerated and of good moral character, she is deserving of mercy.

   (1) COVID-19 is an Extraordinary and Compelling Reason Warranting a Sentence Reduction
        Reduction and considered "Other Reasons" USSG 1b1.13

On March 11, 2020, the World Health Organization ("WHO") officially classified the new strain of coronavirus, COVID-19, as a pandemic. Two days later, on March 13, 2020, President Trump declared the COVID-19 outbreak a national emergency.As of May 29, 2020, COVID-19 has infected more than 5.8 million people worldwide, leading to at least 360,458 deaths. In the United States, at least 1.7 million have been infected, leading to more than 100,000 deaths. These numbers almost certainly underrepresent the true scope of the crisis.

In an effort to slow the spread of COVID-19, CDC guidelines recommend, among other things, that individuals practice social distancing, wear face masks when out in public, and frequently wash their hands with soap and water or a hand sanitizer that contains at least 60% alcohol. But given the conditions at correctional facilities, inmates are often unable to follow these guidelines, leaving them at an especially high risk of contracting the virus. In fact, public health experts are nearly unanimous in their opinion that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in

proactive measures to keep themselves safe," and "infection control is challenging in these settings." A recent opinion piece published in the New York Times highlights why the risk of spreading COVID-19 is so high for those who are incarcerated: "In America's jails and prisons, people share bathrooms, laundry and eating areas. The toilets in their cells rarely have lids. The toilet tank doubles as the sink for hand washing, tooth brushing and other hygiene. People bunked in the same cell—often as many as four—share these toilets and sinks. Meanwhile, hand sanitizer is not allowed in most prisons because of its alcohol content. Air circulation is nearly always poor. Windows rarely open; soap may only be available if you can pay for it from the commissary."

Given these conditions, it is no surprise that COVID-19 is quickly spreading through the federal prison system.

As of October 20, 2020, It was reported on by the medical staff and administration of Tallahassee FCI there are 91 inmates and 15 staff Positive cases of COVID-19. They tested another 13 inmates which has also been confirmed with COVID-19. They do not have sufficient testing, no social distancing, inadequate PPE and sanitation supplies as well as lack of medical staff available.

As the Inspector General states, "providing adequate health care to inmates remains a challenge for the BOP," and "certain characteristics of the BOP's population heighten the challenge of providing proper care for inmates, including aging inmates, inmates with chronic illness, and inmates with mental health issues."

As a result, the BOP is particularly ill-equipped to deal with the COVID-19 crisis as it sweeps the country and devastates places like nursing homes and prisons, where aging individuals with chronic diseases live in conditions that prevent social distancing. Even federal medical centers, like FMC Carswell, are ill equipped, lacking ventilators and other resources to combat this highly contagious disease.

According to the CDC, older adults and/or those with underlying medical conditions are at a significantly higher risk of contracting and becoming seriously ill—and even dying—from COVID-19.

Additionally, preliminary reports from the CDC suggest that, in the United States, people with underlying health conditions—including Asthma, Hypertension, Asthma—appear to be at an especially high risk for severe disease from COVID-19 as compared

to people without any underlying health conditions. Courts have taken judicial notice of the threat posed by COVID-19 to those who are incarcerated, particularly to those who are over 65 or those with one or more underlying medical conditions. See, e.g., Ben-Yhwh, 2020 U.S. Dist. LEXIS 65677, at *10 ("Based on the Center for Disease Control and Prevention reports, the Court takes judicial notice that there is a high probability that COVID-19 will cause older adults with one or more underlying serious medical conditions to be hospitalized and admitted to the intensive care unit...."); see also United States v. Stephens, No. 15-cr-95 (AJN), 2020 U.S. Dist. LEXIS 47846, at *3 (S.D.N.Y. Mar. 19, 2020) (noting that "inmates may be at a heightened risk of contracting COVID-19").

In light of the extraordinary risks faced by inmates like Ms. Earlycutt in the wake of the COVID-19 public health crisis, many district courts— have found that the virus constitutes an extraordinary and compelling reason warranting a reduction in sentence.

Prison reform advocates argue many more could be safely released into supervision, noting the commissioners and courts can order ankle monitors, among other requirements. It's especially urgent during the pandemic, advocates say, since those eligible due to age and/or medical conditions, and therefore at higher risk from COVID-19. The CDC has taken new data and is now standing that a person at any age with underlying medical conditions is at high risk to COVID-19 which can lead to critical illness or death. See. United States v. Dawn Rhodes, No. 4:17CR300 HEA, U.S. District Court (E.D. Missouri, 8/14.2020).

For example, in United States v. Campagna, Judge Schofield granted compassionate release for a defendant suffering from a compromised immune system, which put him at significant risk if he were to contract COVID-19. The court found that the defendant's "compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason" warranting modification of the defendant's sentence. 2020 U.S. Dist. LEXIS 54401, at *8. See also, e.g., United States v. Hernandez, No. 18 Cr. 834-04 (PAE), 2020 U.S. Dist. LEXIS 58739, at *10 (S.D.N.Y. Apr. 2, 2020) (finding "extraordinary and compelling reasons" to reduce the defendant's sentence due to defendant's

asthma and the "heightened medical risk presented to [the defendant] by the COVID-19 pandemic")

Ms. Earlycutt is powerless to take the preventative self-care measures directed by the CDC for her high-risk group to remain safe from COVID-19 infection. She cannot self-quarantine or partake in "social distancing." There are community spaces where inmates and prison staff are in close contact. Additionally, the high- density areas are precisely the kind of spaces that have caused the alarmingly high-spread rates of COVID-19 throughout the United States.

Moreover, hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol content. As a result, correctional health experts worry that no matter what precautions are taken by prisons, these facilities may become incubators for COVID-19.

Given that Ms. Earlycutt suffers from a variety of serious underlying health issues that make her exceptionally vulnerable to COVID-19, extraordinary and compelling circumstances exist to support compassionate release.


(2) Ms. Earlycutt Is Deserving of Mercy

Ms. Earlycutt's exceptional conduct as an inmate and good moral character demonstrate that she is deserving of mercy. This factor, in combination with the other factors discussed above, constitutes an extraordinary and compelling reason warranting a reduction in Ms. Earlycutt's sentence pursuant to Application Note 1(D) of § 1B1.13 of the Sentencing Guidelines.  See United States v. Millan, No. 91-CR-685 (LAP), 2020 U.S. Dist. LEXIS 59955, at *26 (S.D.N.Y. Apr. 6, 2020) (granting compassionate release based, in part, on defendant's model conduct as an inmate and exceptional character); cf. Cantu-Rivera, 2019 U.S. Dist. LEXIS 105271, at *3-4 (reducing defendant's life sentence to time served based principally on "the extraordinary degree of rehabilitation [defendant] has accomplished during the 30 years he has been incarcerated," including "extensive educational achievements," "service as a teaching assistant in several prison facilities for high-school equivalency and English-as-a-Second-Language programs," and "his service in the BOP's suicide watch program, helping to care for inmates placed in solitary confinement due to suicide attempts").

It has been almost 2 years since Ms. Earlycutt was arrested and detained in September 2017 and has proven herself to be a model inmate and a person of good moral character, as demonstrated by her "genuinely exceptional accomplishments and meritorious prison record." Millan, 2020 U.S. Dist. LEXIS 59955, at *26. Her exceptional conduct and accomplishments while incarcerated are unique and distinctively important because she engaged in these positive activities without any tangible incentive other than self-improvement, given that her life sentence meant that she could neither earn "good-time" credit nor any other sentence reduction benefit. See id. at *26-27.

While incarcerated, Ms. Earlycutt has not only sought to improve herself to the utmost extent possible, but she has also dedicated herself to the service of others. Ms. Earlycutt has no record of serious misconduct since being incarcerated—an exceptional achievement for someone who has been incarcerated for more than two decades. She has participated in classes and groups offered by the prison's educational, psychology and religious services; served as an informal support system and mentor to other inmates struggling with personal, medical, and substance abuse. Ms. Earlycutt has displayed an impressingly prosocial behavior while incarcerated. She is a prosocial person who always is willing to sit down and discuss the problems other inmates were suffering whether personal, medical, mental or physical issues.

Among her many accomplishments and good deeds over the past four years, Ms. Earlycutt has volunteered her time helping women of Tallahassee FCI struggling with self-improvement, self-development and preparing for re-entry back into society among other critical issues inmates face.

Ms. Earlycutt has proven herself to be a good Mentor for the inmates, a good organizer, self-motivated, honest, trustworthy, reliable, respectful, and courteous person.

Ms. Earlycutt is very regretful for the past but very positive, having strong intention of further self-improvement, rectification and positive contribution to the outside society upon her release. Her plan is to work with a nonprofit organization to mentor kids whose parents are incarcerated. She also has the desire to pour her life into the lives of others, especially individuals who are at risk for criminal behavior in hopes of turning their lives around by sharing her experience. She is a person of high character and moral virtue. She is very kind, compassionate and sincere.

Ms. Earlycutt's conduct during incarceration, even struggling with her chronic and debilitating medical conditions, she always attempted to help those that she viewed as being less fortunate than herself. Ms. Earlycutt has been able to rise above severe physical handicaps, disabilities, sickness, and distress, and yet pull herself up by her own bootstraps to challenge herself to persist to maintain the duties and responsibilities she has for her friends. She would make an excellent candidate for compassionate release and would adapt wonderfully in any community. Over the years, Ms. Earlycutt has had a positive impact on the lives of many of her fellow inmates.

As above demonstrates,  Ms. Earlycutt is deserving of mercy. Accordingly,this factor, in combination with the other factors discussed above, constitutes an extraordinary and compelling reason warranting a reduction in Ms. Earlycutt's sentence.

## III.   Ms. Earlycutt is Not A Danger To The Safety of Any Other Person Or To The Community

Where extraordinary and compelling reasons exist, compassionate release is appropriate provided the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). The factors set out in § 3142(g) include, among others: (1) "the weight of the evidence against the person"; (2) "the history and characteristics of the person, including—the person's character, physical and mental condition, family ties, employment, financial resources,...community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history"; and (3) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

Despite her conviction which she is not diminishing her crime, which was undeniably wrong but for what was not a violent crime, so there is nothing to suggest that if released today Ms. Earlycutt would pose a danger to the safety of any person or the community. To the contrary, Ms. Earlycutt represents a positive addition to her family and community, who are eager to welcome her back into their lives and care for her.

If granted compassionate release, Ms. Earlycutt will be residing with her brother, Michael Earlycutt at 370 Eagle Nest Way..

Mr. Michael Earlycutt is eager to welcome Ms. Earlycutt home and has agreed to take care of Ms. Earlycutt and ensure that she has access to the best doctors and medical treatments available. Mr. Earlycutt has the financial means to care for Ms. Earlycutt.

Mr. Earlycutt has agreed to care for her ailing sister and will ensure that Ms. Kim Earlycutt has access to the best doctors and medical treatments available. He will take Ms. Earlycutt to her doctors' appointments, and he will make sure Ms. Earlycutt is cared for daily.

The fact that Ms. Earlycutt still maintains close ties with Mr. Earlycutt and, should She is released, intends to live with Mr. Earlycutt which weighs in favor of finding that Ms. Earlycutt does not pose a danger to any other person or to the community. See Davis, 2020 U.S. Dist. LEXIS 40652, at *6-7 (D. Md. Mar. 5, 2020) (finding it unlikely that defendant would recidivate based, in part, on the fact defendant "intends to reside in Miami with his former wife, surrounded by a community of friends"); Cantu-Rivera, 2019 U.S. Dist. LEXIS 105271, at *5 (finding the defendant did not present a danger to the safety of any other person or to the community based, in part, on "the extensive and close ties that [defendant] maintains with his family and community").

Moreover, Ms. Earlycutt's personal history demonstrates that, prior to her incarceration, she remained a devoted member of her home Church in Atlanta.. She plans to continue her participation as an Organizer and Holiday Planner in her Church and become a respected leader advocate in her community and her conduct during her almost 2 years in prison is overwhelmingly positive and reflective of her good moral character. Despite her sentence, Ms. Earlycutt has devoted herself to self-improvement and personal growth.

In many ways, Ms. Earlycutt is not the same person that she was when she was committed almost 2 years ago. She has gone through a genuine transformation over the years into a woman of sound judgment, selfless behavior, and sincere efforts to modify her own views to accommodate others.... She has matured and evolved over the years and has grown in sympathy, sensitivity, and understanding.

She has no thoughts nor has she engaged in any behaviors since incarcerated that would indicate her being a risk of harm to others nor does she pose any risk to recidivate and has only the tendency to deter from any criminal activity.

## IV. Upon Consideration Of The 18 U.S.C. § 3553(a) Factors, Kim Earlycutt'S Time Already Served Is Sufficient But Not Greater Than Necessary To Accomplish The Goals Of Sentencing

Finally, to decide whether a sentence reduction is "warranted" by the "extraordinary and compelling reasons" that apply, the Court must also "consider[] the factors set forth in section 3553(a) to the extent that they are applicable" to determine whether a reduced sentence is appropriate and, if so, what the sentence should be. 18 U.S.C. § 3582(c)(1)(A). Those factors include, among others: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed...to provide just punishment for the offense[,]...to afford adequate deterrence to criminal conduct[,]...to protect the public from further crimes of the defendant[,] and...to provide the defendant with needed...medical care...in the most effective manner"; (3) "the kinds of sentences available"; and (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). "Importantly, these considerations are to be assessed against the overarching principle that a sentence is to be sufficient, but not greater than necessary, for these purposes." Redd, 2020 U.S. Dist. LEXIS 45977, at *20; Davis, 2020 U.S. Dist. LEXIS 40652, at *8. The balance of the § 3553(a) factors supports granting compassionate release.

Courts weighing § 3553(a) factors have granted release to defendants with convictions for serious crimes and with histories of violence, finding that changed health circumstances, aging defendants, post-offense rehabilitation, and carefully crafted conditions of supervised release ameliorate any public safety concerns. In United States v. Bailey, for example, the defendant was sentenced to 30 years for "an extensive racketeering scheme," including a specific finding that the defendant committed offenses relating to a murder. United States v. Bailey, No. 94-cr-481 (N.D. Ill. July 24, 2019) (slip op. at 1).The defendant, who was almost 90 years old, suffered from multiple health issues and had served 25 years of his sentence. Id. The government opposed release under the § 3553(a) factors due to the "reprehensible nature of the offense." Id. Although the court acknowledged the defendant's criminal history and serious offense conduct, it found that more recent factors weighed in favor of compassionate release,

including the defendant's institutional adjustment, lack of disciplinary infractions, the amount of time served, and his advanced age. Id. In weighing these more recent favorable factors over the defendant's criminal history, the court granted the reduced sentencing request, concluding that release at this stage in the defendant's life would not minimize the severity of the offense. The court observed: "[W]hether the Defendant serves 25 or 25 ½ years, he will have spent a very long time in prison, and appropriately so, for very serious offenses." Id. at 2.

In United States v. Asaro, No. 17-cr-127 (ARR), 2020 U.S. Dist. LEXIS 68044 (E.D.N.Y. Apr. 17, 2020), Judge Ross granted a sentence reduction to time served to an 84-year-old career Mafioso, despite a history of violent crimes of the greatest seriousness, including murder of a witness. Id. at *2. Asaro had served about half of a 96-month sentence for yet another violent crime, committed while more than 75. The defendant in that case, like Ms. Earlycutt, had suffered a stroke while incarcerated which substantially impaired his ability to provide self-care, and had numerous other age-related ailments. Id. at *3. On consideration of the heightened risks from COVID-19, the Court granted his compassionate release motion, over adamant government objection. See id. at *16.

In a District of Oregon case, the court likewise granted compassionate release to a defendant serving a 30-year sentence for leading a "major drug conspiracy." Spears, 2019 U.S. Dist. LEXIS 177991, at *13. As explained in the court's opinion, the defendant's history included crimes of violence, his performance on supervised release had been poor, and he committed the last serious offense for which he was serving time when he was in his fifties. Id. at *12-13. Despite these findings, the district court found that the defendant was now 76 years old and suffered from "multiple chronic serious medical conditions and limited life expectancy." Id. at *3. Although the government maintained that the defendant remained dangerous, the court disagreed, concluding that, in light of the defendant's strong family support, the age of his prior convictions, and his diminished physical condition, "appropriate supervision conditions can mitigate any limited risk" to public safety and provide sufficient specific deterrence. Id. at *15.

Similarly, in United States v. McGraw, the court granted compassionate release from the

defendant's life sentence for a drug trafficking conspiracy based principally on the defendant's serious health concerns and diminished ability to provide self-care. The defendant, who was approximately 55 years old at the time of the offense and had been in custody for nearly 17 years, was now 72 years old and suffered from limited mobility, diabetes, chronic pain, chronic kidney disease, and hypertension. 2019 U.S. Dist. LEXIS 78370, at *3. The government argued that the defendant remained a danger to the community because of his leadership in a notorious motorcycle gang, the Diablos Motorcycle Club, noting that he could continue his criminal activity with simple access to a telephone. Id. at *11, 14. The court, however, concluded that given defendant's frail health, his positive record at the institution, and the ability of the court to impose conditions that would reasonably assure the safety of the community upon release, the more flexible compassionate release statute, as amended by the FSA, favored granting defendant's motion. Id. at *15-16. The court found that, under the circumstances, defendant's time already served was sufficient:

> But further incarceration is not needed to deter [defendant] from further offenses; nor, for the reasons described above, is it necessary to protect the public from future crimes. Finally, [defendant] has served much of his sentence while seriously ill and in physical discomfort. This means that his sentence has been significantly more laborious than that served by most inmates. It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2).

Other Courts and Appeal Courts have agreed medical conditions determined by the CDC as high risk along with COVID-19 Pandemic are extraordinary and compelling reasons to warrant sentence reductions.

United States vs. Schella Hope, U.S. District Court, Southern District of Georgia (2020) Case No. CR-213-0161

United States vs. Jeremy D. Zullo, U.S. Appeals Court, 2nd Circuit (2020), Case No. 19-3218-CR

United States vs. Edward Deandre Locke, U.S. District Court, Western District of Washington (2020) Case No. CR18-0132 RAS

United States vs. Julie Michelle Glass, U.S. District Court, Southern District of Mississippi (2020) Case No. 1:15-CR-LG-RHW2

United States vs. Jorge Vazquez Torres, U.S. District Court, Southern District of Florida (2020) Case No. 1:19-CR-20342-BLOOM

United States vs. Adam Clausen, U.S. District Court, Eastern District of Pennsylvania (2020), Case No. 2:00-CR-00291-GJP


The cases cited above amply demonstrate that Ms. Earlycutt's advanced age, frail medical condition, exemplary conduct as an inmate and "Other Reasons" COVID-19 Pandemic and Risks USSG 1B1.13 all weigh in favor of compassionate release. Ms. Earlycutt's sentence has been "significantly more laborious than that served by most inmates," as it has been marred by extreme pain, side effects, and difficulty partaking in normal activities. Moreover, given her underlying medical conditions, she is at an extremely high risk of serious illness or death should she contract COVID-19, which has already infected numerous Tallahassee FCI inmates at this very moment the facility is under complete lockdown, which makes her situation of urgency.

Much of Ms. Earlycutt's pain and suffering over the years is a direct result of MS, Asthma and Heart Disease she's suffered from since being incarcerated. Lack of treatment of her MS disease by the BOP has triggered numerous side effects, pain, unable to provide self-care and progression of other illnesses she is suffering.


Notwithstanding her circumstances and the harsh conditions of her confinement, Ms. Earlycutt has proven herself to be a model inmate and a person of good moral character.

Ms. Earlycutt has no record of serious misconduct since being incarcerated and she is highly regarded by her fellow inmates and the staff at Tallahassee FCI. She has presented herself to be a kind, compassionate, generous, and sincere woman.

Ms. Earlycutt "has proven herself to be a good Mentor for the inmates, a good organizer, self-motivated, honest, trustworthy, reliable, respectful, and courteous person.

During the years, Ms. Earlycutt has always attempted to help those she viewed as being less fortunate than herself. In this regard, she would often spend time talking with other inmates suffering with personal, medical, mental or physical issues.

Ms. Earlycutt has devoted her time to self-improvement and personal growth, demonstrating that, in many ways, Ms. Earlycutt is not the same person that she was when committed to custody 4 years ago. See Cf. Millan, 2020 U.S. Dist. LEXIS 59955, at *26 ("[Defendant] is no longer the immature and irresponsible young man who committed his offenses in his early 20s.... In the almost three decades that have passed since he was arrested (and detained) in 1991, and despite having had no realistic hope of release, [defendant] has done everything in his power to rehabilitate himself, as demonstrated by his genuinely exceptional accomplishments and meritorious prison record."). Under these circumstances, further incarceration "would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)." McGraw, 2019 U.S. Dist. LEXIS 78370, at *16.

The need to provide adequate medical care in the most effective manner also now weighs heavily in favor of allowing Ms. Earlycutt to seek medical treatment outside the confines of the BOP. See 18 U.S.C. § 3553(a)(2)(D); see also Sholler, 2020 U.S. Dist. LEXIS 86084, at *13 ("The Court has considered the applicable sentencing factors from 18 U.S.C. § 3553(a) and finds that they are consistent with granting defendant's motion for compassionate release. Among other considerations, the 'need . . . to provide the defendant with needed . . . medical care . . . in the most effective manner' weighs in favor of early release." (quoting 18 U.S.C. § 3553(a)(2)(D))). Commentators have found significant issues with the BOP's provision of medical care services, noting, in particular, pervasive medical staffing shortages and treatment delays. Even the Inspector General has noted that "providing adequate health care for inmates remains a challenge for the BOP," and "certain characteristics of the BOP's population heighten the challenge of providing proper care for inmates, including aging inmates, inmates with chronic illness, and inmates with mental health issues." These issues are especially concerning in the wake of the COVID-19 public health crisis. As an inmate, Ms. Earlycutt is not entitled to the doctor of her choosing. She cannot schedule timely appointments and it is difficult for her to

25

receive much- needed treatments to mitigate and slow the progression of her illnesses. She has been delayed several necessary medical treatments, based on her prior negative experiences and concerns regarding the quality of treatment options available to her as an inmate at Tallahassee FCI. See. USA vs. Angela Michelle Beck, 1:13-CR-186-6, Middle District North Carolina (June 28, 2019).

If granted compassionate release, Ms.Earlycutt would have the option to explore different treatments to address her illnesses and find medical professionals that present a lower risk of post-treatment complications. The issue of choosing a doctor to provide care has been previously found by at least one district court to be an appropriate factor in granting a request for compassionate release made by the BOP. United States v. DiMasi, 220 F. Supp. 3d 173, 177 (D. Mass. 2016) ("Inmates have a constitutional right to adequate medical care. They do not have a right to optimal medical care or to the doctors of their choice. While on Supervised Release, [defendant] will have the liberty of selecting the doctors and hospitals he wants to treat him, and will have the opportunity to obtain what may be better medical care than he would if he remained in custody.").

As noted, if granted compassionate release, Ms. Earlycutt will reside with her brother, Mr. Michael Earlycutt and he will ensure that Ms. Earlycutt has access to the best medical care available.   Mr. Earlycutt  has the financial means to be able to provide Ms. Earlycutt with a higher quality of care than that which is available at Tallahassee FCI. The fact that treatment in the community would be more efficient, timely, and less burdensome on the BOP's medical costs also weighs heavily in favor of reducing Ms. Earlycutt's sentence. Additionally Ms. Earlycutt's frail condition demonstrates that Ms. Earlycutt is unlikely to reoffend and does not pose a danger to the community.

Courts have repeatedly recognized that inmates in Ms. Earlycutt's age group are the least likely to recidivate. See, e.g., Redd, 2020 U.S. Dist. LEXIS 45977, at *23 (noting that a 64-year-old defendant is "statistically unlikely to recidivate"); Mondaca, 2020 U.S. Dist. LEXIS 37483, at *15 ("Defendant is 77 years old and in the class of prisoners least likely to recidivate.").

Ms. Earlycutt's physical and mental condition show that the aging process will now limit her engagement in anything that could present a danger.

McGraw, 2019 U.S. Dist. LEXIS 78370, at *13 (reducing defendant's life sentence to time served based principally on his serious medical conditions, even though he had a long criminal history and had occupied a leadership position in the Diablos motorcycle gang, noting that defendant's "frail condition...demonstrates that there are conditions the Court could impose to 'reasonably assure...the safety of any other person and the community'"); United States v. Brittner, No. CR 16-15-M-DLC, 2019 U.S. Dist. LEXIS 73653, at *9 (D. Mont. May 1, 2019) ("[T]he Court is convinced that [defendant] poses no safety risk to the community. [Defendant] is in an advanced stage of cancer and is wheelchair bound. He is fatigued, weak, and his memory continues to worsen.").

Finally, Ms. Earlycutt's release, after serving almost 2 years, would not be outside of the mainstream, nor would it minimize the severity of the offense. In terms of "sentences available," § 3553(a)(3). And, in fact, "the need to avoid unwarranted sentence disparities," as provided in § 3553(a)(6), actually weighs in favor of compassionate release in this case.

Ms. Earlycutt's time already served "is also a period of time that promotes respect for the law and provides just punishment.

Now during her ailing health conditions, if granted compassionate release, the time Ms. Earlycutt has left will be spent attempting to manage her illnesses, limiting her level of pain and discomfort, and reconnecting with her family. For the reasons detailed above, the§ 3553(a) factors weigh in favor of finding that to change Ms. Earlycutt's time to spend the remainder of her sentence on Home Confinement is sufficient and that further incarceration would be greater than necessary to accomplish the goals of sentencing.

Recently, Ms. Earlycutt's facility is having a high exposure to COVID-19 which she is in even greater risk of contracting coronavirus in fear of death. Several inmates in her unit have tested positive for coronavirus and the facility is inadequately prepared for the pandemic of COVID-19 which will drastically and quickly spread among the inmates.

For all these reasons, a reduction in sentence for the extraordinary and compelling reasons that exist in this case would be "warrant[ ed]."

18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court can reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release not to exceed the term of imprisonment.

Confinement in a home environment would be significantly safer for Ms. Earlycutt as her exposure to COVID-19 would be severely limited. In 2018, The Federal Bureau of Prisons reported that the average cost for a federal inmate was $36,299.25 per year, or $99.45 per day. That amount is drastically higher with inmates with severe illnesses and conditions as Ms. Earlycutt.

For the foregoing reasons, extraordinary and compelling reasons exist that warrant reduction of defendant Kim Earlycutt's sentence. She therefore respectfully asks the Court to reduce her sentence. Moreover, in light of the nature of this request and Ms. Earlycutt's condition, the Court is respectfully requested to expedite the consideration of this motion to the extent possible.

Respectfully Submitted on 11th of September 2020.

Kim Earlycutt No. 70703-019

UCC 1-308

Tallahassee FCI

P.O. Box 5000

Tallahassee, FL 32314

## CERTIFICATE OF SERVICE

I hereby certify, under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. 1746 that I have served a true and correct copy of the foregoing:

- Motion for Expedited Compassionate Release To Home Confinement is served upon the following address(es) by placing same in sealed envelope, bearing sufficient postage for delivery via US Postal service FIRST CLASS MAIL to:

United States District Court Clerk
2167 Richard B. Russell Federal Building
75 Ted Turner Drive, SW
Atlanta, Georgia 30303

United States Attorney Office
Richard B. Russell Federal Building
75 Ted Turner Drive, SW Suite 600
Atlanta, Georgia 30303

Dated: September11th, 2020

Kim Earlycutt Reg. #70703-019
Without prejudice UCC 1-308
Tallahassee FCI
P.O. Box 5000
Tallahassee, FL 32314

Response to Inmate Request to Staff
Inmate: EARLYCUTT, Kim
Register NO: 70703-019
Institution: FCI/FDC Tallahassee

This is in response to your correspondence wherein you request to be considered for an immediate Compassionate Release based on extraordinary and compelling circumstances and your concerns about COVID-19.   Specifically, you request consideration based upon your medical issues for moderate asthma and heart conditions.

Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C.§§ 3582 and 4205(g), states "a sentencing court, on motion of the Director of the Bureau of Prisons, may reduce the term of imprisonment of an inmate sentenced under the Comprehensive Crime Control Act of 1984." Currently, you do not meet the criteria for extraordinary and compelling circumstances such as medical which is consistent with an Incurable/Progressive Illness or Debilitating Injury. Although you have a chronic medical condition, you are able to independently attend to your daily living activities.

Secondly, the BOP is taking extraordinary measures to contain the spread of COVID-19 and treat any affected inmates.  We recognize that you, like all of us, have legitimate concerns and fears about the spread and effects of the virus; however, your concern about being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an early release from your sentence.

Your request has been evaluated consistent with Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C.§§ 3582 and 4205(g). Accordingly, you have not demonstrated your request meets the minimum eligibility requirement for Compassionate Release/Reduction in Sentence.

If you are not satisfied with this response to your request, you may commence an appeal of this decision via the Administrative Remedy process by submitting your concerns on the appropriate form (BP-9) within 20 days of the receipt of this response.

_____                    _5|11|20_____
E. Strong, Warden                           Date

FEDERAL CORRECTIONAL INSTITUTION (FCI), TALLAHASSEE, FLORIDA
PART B-RESPONSE TO REQUEST FOR ADMINISTRATIVE REMEDY #1025449-F1

This is in response to your Request for Administrative Remedy, received on June 2, 2020, wherein you state, you were denied a Compassionate Release due to your physical health. For relief, you are requesting to be considered for the Coronavirus Aid Relief and Economic Security Act (CARES ACT).

A review of this matter indicates, Attorney General Barr's memorandum dated March 26, 2020, stated the following criteria were to be used when reviewing inmates for Home Confinement. The criteria are as stated:

- The age and vulnerability of the inmate to COVID-19, in accordance with Centers of Disease Control and Prevention guidelines.

- The security level of the facility currently holding the inmate, with priority given to inmates residing in Low and Minimum security facilities.

- The inmate's conduct in prison, with inmates who have engaged in violent to gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under the Memorandum.

- The inmate's score under pattern, with inmates who have anything above a Minimum score not receiving priority treatment under this Memorandum.

- Whether the inmate has demonstrated a verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would in his or her BOP facility.

- The inmate's crime of conviction, and assessment of danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

Based on the above information, you were re-scored on your Pattern Score on June 1, 2020, you scored as Low risk to recidivate.  At this time, you are ineligible based on your Pattern Score. This response to your Request for Administrative Remedy is denied

If you are not satisfied with this response, you may appeal to the Regional Director at Bureau of Prisons, Southeast Region Office, 3800 Camp Creek Parkway, SW Building 2000, Atlanta, Georgia, 30331.  Your appeal must be received in that office within 20 calendar days of the date of this response.

_____                          6/30/20
Strong, Warden                                   Date

Response to Inmate Request to Staff
Inmate: EARLYCUTT, Kim A
Register NO: 70703-019
Institution: FCI/FDC Tallahassee

This is in response to your request for immediate consideration
for release to Home Confinement pursuant to Attorney General
Barr's March 26, 2020, memorandum.

In an effort to protect the health and safety of staff and
inmates during the COVID-19 pandemic, it has become imperative
to review at-risk inmates for placement on Home Confinement. The
Bureau of Prisons (BOP) is to consider the totality of
circumstances for each individual inmate, the statutory
requirements for Home Confinement, and the following non-
exhaustive list of discretionary factors:

1)    Primary Offense is not violent
2)    Primary Offense is not sex offense
3)    Primary Offense is not terrorism
4)    No detainer
5)    Mental Health Care Level is less than IV
6)    PATTERN risk score is MIN
7)    No Incident Reports in the past 12 months
8)    Inmate must have served at least 50% of their sentence
9)    Or have 18 months or less remaining on their sentences and
      have served 25% or more of their sentences

Based on the above information, you were re-scored on
June 1, 2020, you scored as Low risk to recidivate.  At this
time, you are ineligible based on your Pattern Score. As such,
your request for release to Home Confinement is denied at this
time.

If you are not satisfied with this response to your request, you
may commence an appeal of this decision via the Administrative
Remedy process by submitting your concerns on the appropriate
form (BP-9) within 20 days of the receipt of this response.

_____                    _9/22/20_
E. Strong, Warden                           Date

Received
10/5/20
ml